1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10
DERRIC STITT,                              1:10-CV-01270 LJO SMS HC
11
                    Petitioner,            ORDER DENYING PETITION FOR WRIT OF
12                                          HABEAS CORPUS
         v.
13                                          ORDER DIRECTING CLERK OF COURT TO
                                            ENTER JUDGMENT FOR RESPONDENT
14  JAMES A. YATES, Warden,
                                            ORDER DECLINING ISSUANCE OF
15                  Respondent.             CERTIFICATE OF APPEALABILITY
    _____/
16

17         Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant

18  to 28 U.S.C. § 2254.

19                              **BACKGROUND**[1]

20         Petitioner is currently in the custody of the California Department of Corrections pursuant to a

21  judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial

22  on April 29, 2008, of the following: (1) second degree robbery (Count 1; Cal. Pen. Code[2] § 211); (2)

23  second degree commercial burglary (count 2; §§ 459/460(b)); (3) receiving stolen property (count 3; §

24  496(a)); (4) attempted grand theft of property (count 4; §§ 664/487(a)); (5) identity theft (count 5; §

25  530.5(a)); and (6) resisting a peace officer (count 6; § 148(a)(1).  In a bifurcated proceeding, the jury

26  _____

27         [1]This information is derived from the state court records lodged by Respondent with his response and is not subject
    to dispute.

28         [2]All further statutory references are to the California Penal Code unless otherwise indicated.

1   found true the allegations that Petitioner had the following five prior serious or violent felony

2   convictions pursuant to §§ 667(b-i), 1170.12(a-d), and 667(a)(1):  (1) two November 8, 1983, robbery

3   convictions (§ 211); (2) a July 3, 1985, robbery conviction; (3) a November 20, 1992, robbery

4   conviction; and (4) a November 20, 1992, first degree burglary conviction (§§ 459/460(a)). The jury

5   further found true allegations that the July 3, 1985 and November 20, 1992 convictions were prior

6   convictions within the meaning of § 667.5(b).

7       Petitioner filed a <u>Romero</u>[3] motion, which requested, inter alia, that the trial court strike or dismiss

8   his prior strike convictions, stay any prison term to be imposed, and order him into an in-patient drug

9   treatment program. The trial court denied the motion and sentenced Petitioner as follows: (1) an

10  indeterminate term of 25 years to life on count 1; (2) a consecutive indeterminate term of 25 years to life

11  on count 2; and (3) stayed indeterminate terms of 25 years to life on counts 3 through 5. The trial court

12  also imposed a 15-year term and an additional stayed five-year term for the section 667(a) priors.

13      On December 11, 2009, the California Court of Appeal, Fifth Appellate District (hereinafter

14  "Fifth DCA"), affirmed the judgment of the trial court on all counts except for count 3 (receiving stolen

15  property), which it reversed.  Petitioner filed a petition for review in the California Supreme Court on

16  January 21, 2010.  The petition was summarily denied on March 24, 2010.

17      On July 16, 2010, Petitioner filed the instant federal habeas corpus petition.  In the section of

18  Petitioner's form petition titled "Ground one," Petitioner states "See Petitioner's 'Petition for Review'

19  for points and authorities," and in the section titled "Supporting FACTS" Petitioner states, "See

20  Petitioner's 'Petition for Review' argument, pages 9-30."  This court understands this to be in reference

21  to Petitioner's California Supreme Court Petition for Review (Resp't's Lodged Doc. 5), which raises the

22  following four (4) claims for relief: (1) the suppression by the prosecution of the photographic lineup

23  shown to the robbery victim four days after the offense, and of the victim's resulting photo identification

24  of Petitioner as a perpetrator of the offense, deprived Petitioner of his state and federal rights to due

25  process and confrontation in violation of Amendments VI and XIV; (2) the trial court committed

26  reversible error and violated Petitioner's state and federal rights to a fair trial and due process by

27

28

---

[3] <u>People v. Superior Court (Romero)</u>, 13 Cal.4th 497 (1996).

1   permitting impeachment of Petitioner with scarcely probative but highly prejudicial prior felony

2   convictions, and with evidence of the nature of the priors in violation of Amendments V, VI, and XIV;

3   (3) the loss of a piece of evidence used at trial, Petitioner's § 969(b) packet, denies Petitioner his rights

4   to due process and meaningful appellate review in violation of Amendment XIV; and (4) the three strikes

5   law is cruel and unusual punishment both on its face and as applied to Petitioner in this case in violation

6   of Amendment VIII.  On September 30, 2010, Respondent filed an answer to the petition.  Petitioner

7   filed a traverse on January 14, 2011.

8                                      **STATEMENT OF THE FACTS**[4]

9

10          At around 6 or 7 p.m. on July 15, 2007, Rodolfo Sanchez stopped at a gas station in
       Fresno. After speaking with Starlene Hale about an exchange of sex for money, she got into his
11     truck and directed him to a nearby cemetery. The two walked to a secluded area, where they
       removed Sanchez's pants. Hale grabbed the pants, in which were Sanchez's car keys and wallet,
       and ran away. Inside the wallet were Sanchez's credit cards and driver's license. At almost the
12     same time, [Petitioner], who Sanchez described as having at least one tattoo on his shoulder and
       arm, appeared with another man. [Petitioner] came within six feet of Sanchez and threatened him
13     with an 18- to 24-inch long piece of metal. Sanchez was scared and started running. Sanchez saw
       [Petitioner], Hale and the other man leave together in a truck. Sanchez did not give anyone
14     permission to take his things. Sanchez did not contact the police, although he called his credit
       card company when he got home.

15
            At around 10:30 p.m. that night, an employee at a Fresno superstore sold a watch to a
16     white gentleman who had tattoos on his arms, neck and body. The man used Sanchez's credit
       card and driver's license to make the purchase and signed Sanchez's name on the receipt's
17     signature line. While the employee determined the names on the credit card and driver's license
       matched, she did not look to see if the driver's license picture matched the man's face.

18
            After this, a man tried to purchase a digital camera and a video camera totaling $726.53
19     from another store employee, Michelle Mejia, who identified the man as [Petitioner]. [Petitioner]
       gave Mejia Sanchez's credit card. When Mejia asked for identification, [Petitioner] gave her
20     Sanchez's driver's license. While the names on the driver's license and credit card matched, the
       picture on the license did not look like [Petitioner], as the picture was "totally different." Mejia
21     alerted the store manager, Francisco Hernandez, who, under the guise of needing to obtain
       transaction approval, took both the credit card and identification to the back of the store and
22     called the police. Mejia stayed at the register with [Petitioner], who was "very jumpy," impatient
       and frustrated. At one point, Hale came up to the register with a few articles of clothing and
23     spoke with [Petitioner], but left when [Petitioner] told her he was waiting for approval. After
       waiting 20 to 30 minutes, [Petitioner] asked for the credit card and identification back.

24
            While still at the register, [Petitioner] saw a police officer, who had been dispatched to
25     the superstore, coming toward him and began running out of the store. Although the officer gave
       [Petitioner] a lawful command to stop, he continued running. The officer was unable to detain
26     [Petitioner], but arrested Hale outside the store. Fresno Police Officer William Wyatt spoke with

27     _____

28     [4]The Fifth DCA's summary of the facts in its June 26, 2008 opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2),
       (e)(1).  Thus, the Court adopts the factual recitations as set forth by the Fifth DCA.

Hale after she was in custody. Officer Wyatt did not notice any symptoms that would indicate Hale was under the influence of drugs. Hale told him she had taken Sanchez's property at the cemetery and [Petitioner] had been there as well. She stated [Petitioner] ran up to where she and Sanchez were, and she left the cemetery with [Petitioner]. Hale did not mention anyone else being there.

Other officers were dispatched to the area. They saw a white male, later identified as [Petitioner], running through a store parking lot and attempted to detain him. When [Petitioner] refused to stop, the officers got out of their patrol car and chased him. Eventually they caught up to him and got him on the ground. [Petitioner] resisted the officers' commands to place his hands behind his back and only complied after an officer applied pressure on his back.

Fresno Police Detective Richard Mora, who conducted a follow-up investigation, used a computer program to generate two photographic lineups of six persons which he showed to Sanchez, one that included a photograph of [Petitioner] and the other a photograph of Hale. Sanchez identified [Petitioner] and Hale as the individuals who robbed him. Detective Mora acknowledged that in [Petitioner]'s lineup, his was the only picture that showed tattoos, and explained that while he searched the lineup the computer gave him for people with tattoos, he could not find anyone with tattoos who had facial features similar to [Petitioner's], so he elected "to go with facial features." Although Sanchez had told an officer the men at the cemetery were between 19 and 25 years old, he did not consider including individuals with tattoos who were 19 to 25 years old in [Petitioner's] lineup because he was trying to match [Petitioner's] age, which was around 44 at the time.

Hale testified she did not remember much of what happened that day because she was coming off of drugs. Hale had decided to rob someone because she needed money for drugs and planned to take Sanchez to the cemetery and rob him. She identified the two other men at the cemetery as Kyle and Jason, who were between 18 and 25 years old. After Hale ran away with Sanchez's pants, she met up with Kyle and Jason, who drove her to another gas station, where [Petitioner] picked her up. She did not remember [Petitioner] going to the cemetery or telling officers he was there. Hale acknowledged she and [Petitioner] went to the superstore, and testified she handed the credit card and identification to [Petitioner] before they went into the store so he could purchase items for her. Hale claimed she told [Petitioner] she had permission to use the credit card and identification, and may have told [Petitioner] the items were stolen only after [Petitioner] was waiting for transaction approval.

Defense

While Hale had been a co-defendant in the present case, she pled to a felony before trial. Hale confirmed her testimony was that after she ran away from Sanchez, two men who were at the cemetery gave her a ride to a gas station, where she called Mike for a ride. In response to that call, [Petitioner] came and gave her a ride to her mother's, where he stayed with her and worked in the yard. Hale did not tell him what had taken place at the cemetery. Hale claimed [Petitioner] was reluctant to help her with the purchases at the superstore, but she assured him she had the owner's permission to ask a man to help with the purchases.

Defense investigator Herbert Crumb spoke with Sanchez about the description Sanchez provided to the police on the day of the robbery. Sanchez did not deny he told the police the description included the age range of 19 to 25. Sanchez told Crumb he wasn't very good at judging age and although he told officers the age range was 19 to 25, the individual he saw was anywhere between 30 and 40. Crumb conceded the only difference between Sanchez's original description to police and the description he gave Crumb was the age range.

[Petitioner] testified in his own defense. He denied being at the cemetery and stated that after Hale called for a ride, he picked her up at a gas station and took her to her stepmother's

house, where they ingested drugs. Later that day, he agreed to take Hale to the superstore and use Sanchez's credit card and driver's license which Hale said a friend had given her to use to purchase a digital camera. [Petitioner] claimed he did not know the credit card had been stolen earlier that day. Hale gave [Petitioner] Sanchez's credit card and driver's license in the superstore's parking lot, and reassured him she had permission to use them. [Petitioner] said he got nervous when the transaction approval was taking a long time, which was when Hale whispered to him that the card was stolen. [Petitioner] told the cashier to keep the stuff and turned to leave the store when he saw a cop. [Petitioner] said he ran because he was afraid due to his criminal record. When he ran out of the store, he went across the street, sat down, and either passed out or fell asleep. He awoke and ran some more when officers approached him. [Petitioner] conceded he resisted the officers who arrested him.

Although [Petitioner] admitted on cross-examination that he used Sanchez's credit card and identification to buy the watch, and signed Sanchez's name, he claimed he never intended to pretend he was Sanchez. [Petitioner] admitted he had two prior convictions for robbery in 1984, robbery convictions in 1985 and 1992, a "theft-related felony" conviction in 1985, and a residential burglary conviction in 1992.

When recalled, Sanchez remembered viewing the photographic lineup and identifying [Petitioner]. Sanchez admitted the individuals in the lineup did not look to be between 19 and 25 years old. He identified [Petitioner] in the lineup based on "his face only" and not on his tattoos. Sanchez agreed he initially lied to police when he stated he met Hale at the circus that day, but he later told police he had not been completely forthright and had actually seen Hale when he was driving and she was walking on the side of the road.

(See Resp't's Lodged Doc. 4.)

## DISCUSSION

I.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a) (2010); 28 U.S.C. § 2241(c)(3) (2010); Williams v. Taylor, 529 U.S. 362, 375, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. §§ 2254(a), 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), cert. denied, 520 U.S. 320 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the

1  enactment of the AEDPA and is therefore governed by its provisions.

2  II.    Standard of Review

3      The instant petition is reviewed under the provisions of the AEDPA which became effective on

4  April 24, 1996.  Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Under the AEDPA, a petitioner can

5  prevail only if he can show that the state court's adjudication of his claim:

6      (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly
       established Federal law, as determined by the Supreme Court of the United States; or

7
8      (2) resulted in a decision that was based on an unreasonable determination of the facts in light
       of the evidence presented in the State court proceeding.

9  28 U.S.C. § 2254(d); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

10     As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal

11 law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71, quoting 28

12 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to

13 the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant

14 state-court decision."  Id., quoting Williams, 592 U.S. at 412.  "In other words, 'clearly established

15 Federal law' under 28 U.S.C. § 2254(d)(1) is the governing legal principle or principles set forth by the

16 Supreme Court at the time the state court renders its decision."  Id.

17     Finally, this Court must consider whether the state court's decision was "contrary to, or involved

18 an unreasonable application of, clearly established Federal law."  Lockyer, 538 U.S. at 72, quoting 28

19 U.S.C. § 2254(d)(1).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

20 state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law

21 or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable

22 facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.  "Under the 'reasonable application

23 clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal

24 principle from [the] Court's decisions but unreasonably applies that principle to the facts of the

25 prisoner's case."  Williams, 529 U.S. at 413.

26     "[A] federal court may not issue the writ simply because the court concludes in its independent

27 judgment that the relevant state court decision applied clearly established federal law erroneously or

28 incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court

1   making the "unreasonable application" inquiry should ask whether the state court's application of clearly

2   established federal law was "objectively unreasonable." Id. At 409.

3       Petitioner has the burden of establishing that the decision of the state court is contrary to or

4   involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94

5   F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth

6   Circuit precedent remains relevant persuasive authority in determining whether a state court decision

7   is objectively unreasonable. See Duhaime v. Ducharne, 200 F.3d 597, 600-01 (9th Cir. 1999).

8       AEDPA requires that we give considerable deference to state court decisions. "Factual

9   determinations by state courts are presumed correct absent clear and convincing evidence to the contrary,

10  28 U.S.C. § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual

11  determination will not be overturned on factual grounds unless objectively unreasonable in light of the

12  evidence presented in the state court proceedings, 28 U.S.C. § 2254(d)(2)." Miller-El v. Cockrell, 537

13  U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure

14  fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

15  III.    Review of Claims

16          A.  Prosecution's Suppression of the Photographic Lineup

17      Petitioner first alleges that his constitutional rights to due process and to confront witnesses were

18  violated by the prosecution's suppression of (1) evidence of a photo lineup shown to the victim prior to

19  the preliminary hearing; (2) evidence of an identification of Petitioner made by the victim from that

20  lineup prior to the preliminary hearing; (3) and of evidence of the victim's statement to the police taken

21  at the time of the identification. Respondent contends Petitioner is incorrect and the state court

22  reasonably rejected the claim.

23      Petitioner presented this claim on direct appeal to the Fifth DCA and California Supreme Court.

24  Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that

25  decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to

26  have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991)

27  (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's

28  reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663,

669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the appellate court stated as follows:

*I.  The Prosecution's Suppression of the Photographic Lineup*

[Petitioner] contends the prosecutor's failure to timely disclose a police report that contained Sanchez's description of the men at the cemetery and the photographic lineup constitutes prosecutorial misconduct under federal and state law, as well as a <u>Brady</u> violation. We disagree.

<u>Trial Proceedings</u>

While a public defender was appointed to represent [Petitioner] at the July 18, 2007 arraignment, a conflict was declared on July 24, 2007 and [Petitioner] was appointed counsel from the alternate defender's office, which represented [Petitioner] at the August 29, 2007 preliminary hearing. On February 5, 2008[FN3], the first day of trial, defense counsel, who was from the alternate defender's office but did not represent [Petitioner] at the preliminary hearing, reported she had received a police report and photographic lineups that had not been provided to her previously. The prosecutor stated the information was not new and should have been provided with the original discovery. Defense counsel explained the report was not in the alternate defense office file and she had no reason to believe it had been received by her office. The court granted defense counsel's request to revisit the issue after she had a chance to review the documents.

FN3. All subsequent references to dates are to dates in 2008 unless otherwise indicated.

Defense counsel subsequently filed a motion for sanctions or dismissal based on asserted violations of the California discovery statutes, Brady, and denial of [Petitioner's] rights to confrontation and due process, arising from the prosecutor's failure to disclose evidence with respect to the out-of-court identification procedure, Sanchez's out-of-court identification of [Petitioner], and Sanchez's identification statement. At the hearing on the motion, defense counsel stated that based on her knowledge, her office had never received the photographic lineup and the day before trial was the first time she received the lineup and Detective Mora's report, which was dated July 19, 2007-the date the photographic lineup was actually shown to Sanchez.

Defense counsel confirmed she was asking the court to (1) dismiss the case or impose some other evidentiary sanction against the People because of the failure to provide the additional reports in a timely fashion in violation of [Petitioner's] due process rights and section 1054.1, or (2) take some action with respect to Sanchez's identification of [Petitioner], e.g., preclude his testimony, as he was shown an impermissibly suggestive lineup that resulted in an irreparable misidentification or substantial likelihood of that. Defense counsel asserted that because the defense was not aware of the photographic lineup, Sanchez could not have been cross-examined at the preliminary hearing about his identification of [Petitioner], and argued there was nothing to suggest Sanchez had an independent basis for identifying [Petitioner] other than [Petitioner] being the only person in the lineup with visible tattoos.

The prosecutor asserted the reports were part of the original discovery provided to defense counsel at the arraignment, although he did not have personal knowledge of this since he did not handle the arraignment and acknowledged Sanchez was shown the lineup the day after

the arraignment. He also did not have a record of any discovery being turned over after the arraignment, although he believed the reports were turned over before the preliminary hearing since [Petitioner's] counsel did not ask Sanchez at that hearing more questions about his identification of [Petitioner]. The prosecutor argued the lineup was not unduly suggestive because all of the individuals were of a similar age group, and had similar characteristics and facial features.

The court found a serious issue had been raised regarding whether the defense was provided the discovery earlier, noting that neither attorney could personally vouch for whether that had occurred. The court thought there was "sufficient evidence to suggest that it probably did not occur until the beginning of this trial." The court stated that while the failure to disclose "may be a technical violation" of the prosecutor's obligation under section 1054.1 to provide the materials 30 days before trial, "in the court's view it certainly doesn't rise to the level of a due process violation. There's no suggestion at this point that this is Brady material at all. As a matter of fact, I think there's an argument at least that it further demonstrates the defendant's culpability in the fact that it's a previous identification of him in other than a courtroom setting. So I'm not inclined to accept the principle right now that this is Brady information at all." The court denied the request to dismiss the case or impose an evidentiary sanction.

With respect to whether the lineup was unduly suggestive, the court found the issue premature and speculative, since "all kinds of things could have happened" when Sanchez was shown the photographic lineup, and offered the defense the opportunity to hear testimony from Sanchez and Detective Mora on that issue. Defense counsel requested a continuance of the trial so she could have her investigator interview Sanchez and possibly retain an eyewitness identification expert; she renewed that request after the court gave her an opportunity to discuss the options with [Petitioner]. The prosecutor informed the court he had spoken with the prosecutor who handled the case before him, who told him everyone was aware of the information before the preliminary hearing, although he could not point to a specific date when the information was turned over and was unwilling to come to testify under oath that she gave the discovery over on a particular date. The court stated it did not need to go any further "on that" and continued the trial until March 13.

The trial began on April 22. Included in defense counsel's in limine motions were motions to dismiss count 1 or exclude Sanchez's statements to officers and at the preliminary hearing regarding his identification of [Petitioner] on the grounds of denial of due process because (1) the prosecution suppressed the police report that stated Sanchez had been shown a photographic lineup and identified [Petitioner] as being present at the robbery, and (2) the photographic lineup was unduly suggestive. Noting that defense counsel would have the opportunity to fully and completely cross-examine Sanchez during trial, the court denied the motion with respect to the prosecution's failure to provide the report and photographic lineup before the preliminary hearing. With respect to the suggestiveness of the lineup, the court delayed ruling on the motion so it could study the issue further.

The following day, the prosecutor informed the court that he had reached an agreement with defense counsel that the prosecution would not seek to introduce the photographic lineup of [Petitioner] and Sanchez would not testify regarding it, but Sanchez would be able to testify regarding his in-court identification of [Petitioner] at the preliminary hearing.

At trial, Sanchez testified that of the two men at the cemetery, he paid more attention to [Petitioner] because [Petitioner] was closer to him and looked directly at him, which allowed him to get a good look at [Petitioner's] face. Sanchez was able to see the tattoo on [Petitioner's] body, but did not remember what the tattoo depicted. Sanchez further testified he had identified both Hale and [Petitioner] at the preliminary hearing; he had given police a description of [Petitioner] when he first spoke to them, which was "[m]ore or less the same description of what [Petitioner] ... looked like"; he did not remember exactly the description he gave police; he did not know

[Petitioner's] age, but thought he looked to be between 30 and 35 years old; and he knew [Petitioner] was the person he saw at the cemetery. On cross-examination, Sanchez testified he did not remember telling police that the men were between 19 and 25 years old. Sanchez admitted he could not tell "exactly very well" what the man who approached him looked like, explaining: "I don't forget his face, but the rest I didn't even pay attention." Sanchez agreed everything at the cemetery happened very fast.

During the defense case, defense counsel informed the court she wanted to recall Sanchez so she could question him about his ability to identify [Petitioner] based on his viewing of the photographic lineup. In a discussion outside the jury's presence, defense counsel explained to the court it was her position that Sanchez did not remember [Petitioner's] face from the cemetery, but he remembered it from the photographic lineup he saw four days after the crime. The prosecutor objected to the defense recalling Sanchez for this purpose, explaining that the prosecution had intended to use the photographic lineup but agreed not to do so because the court had "made it clear" that it would grant the defense's motion in limine to exclude the lineup, and to allow the defense to bring the lineup in now would make it appear as if the prosecution was "hiding the ball." The prosecutor asked to reopen the People's case-in-chief so he could call the detective who showed the lineup to Sanchez. The court granted the People's request.

The court read the following stipulation to the jury: "It is stipulated between the parties[,] the Defense, the Prosecution and this Court[,] that the defense previously sought to exclude evidence of a photo line-up. The Court granted that request to exclude that evidence. Based upon that order, the People did not previously introduce the photo line-up into evidence. The Defense has now withdrawn their objection and wishes the Court to order that the photo line-up be admitted into evidence for purposes of questioning Mr. Sanchez regarding identification issues. Based upon this change of position, the Court is allowing the People to reopen their case regarding testimony regarding the photo line-up."

Detective Mora then testified about his compilation of the photographic lineup and Sanchez's identification of [Petitioner] from the lineup. He explained that before showing Sanchez the lineup, he advised him that the lineup may or may not contain the person who committed the crime being investigated, that hairstyles and beards may change, complexions might not always be the same, it was important for him to pick the right person, and to let him know if he didn't see the person involved. When he showed Sanchez the lineup, Sanchez scanned every photo and then "key[ed] in" on [Petitioner's] photo, which he pointed to and said "this one right here." Sanchez confirmed that was the person who robbed him. When defense counsel recalled Sanchez, she showed Sanchez the lineup and asked if he recognized it. Sanchez responded, "I think it's him." Sanchez confirmed that was the lineup he was shown and testified he did not talk about the tattoos or the ages of the individuals in the photos.

Analysis

[Petitioner] first contends that the prosecution's suppression of the photographic lineup, Sanchez's identification before the preliminary hearing and his statements to police constituted prosecutorial misconduct that rendered his trial fundamentally unfair. Under federal law, a prosecutor's conduct constitutes misconduct if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Darden v. Wainwright (1986) 477 U.S. 168, 181.) "Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" (People v. Hill (1998) 17 Cal.4th 800, 819.)

[Petitioner] has not demonstrated that the prosecutor engaged in misconduct within the meaning of either the state or federal definition. [Petitioner] has not shown that the prosecutor's failure to disclose the photographic lineup or Sanchez's description of the robbers in a timely

manner was intentional or constituted deceptive or reprehensible conduct[FN4]. The belated production of the evidence did not render [Petitioner's] trial fundamentally unfair. After the trial court found that the evidence was not provided to defense counsel until the eve of trial, it granted a continuance of the trial so the defense could investigate further. At trial, defense counsel was able to fully cross-examine Sanchez about his identification of [Petitioner] as the robber and to question him about the photographic lineup, the use of which defense counsel stipulated to at trial. From this, defense counsel was able to argue in closing that Sanchez identified [Petitioner] from the lineup because his picture showed a tattoo. Defense counsel also was able to cross-examine Detective Mora about the lineup and Sanchez's statements about the robbers' ages. Simply put, defense counsel was able to develop fully the inconsistencies in Sanchez's description of the robbers, as well as the inconsistencies between that description and his identification of [Petitioner] from the photographic lineup.

> FN4. On appeal, the People contend that it can be presumed from the questioning at the preliminary hearing that the evidence was provided before that hearing. In ruling on the defense motion in February 2008, however, the trial court found the evidence had not been provided until the eve of trial. This finding is supported by the record, as shown by the prosecutor's acknowledgement that he had no personal knowledge or notation in his file that could prove when the evidence was turned over to the defense and defense counsel's statements that the evidence was not in the defense file. Accordingly, for purposes of this discussion, we will presume that the evidence had in fact not been turned over until February 2008.

But even if we were to conclude otherwise, prosecutorial misconduct requires reversal of a conviction only if it is prejudicial. "Misconduct that infringes upon a defendant's [federal] constitutional rights mandates reversal of the conviction unless the reviewing court determines beyond a reasonable doubt that it did not affect the jury's verdict. [Citations.] A violation of state law only is cause for reversal when it is reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the untoward [conduct]." (People v. Pigage (2003) 112 Cal.App.4th 1359, 1375 (Pigage).)

[Petitioner] cannot show prejudice because apart from Sanchez's identification of [Petitioner] as one of the robbers, other evidence placed [Petitioner] at the scene of the robbery. Significantly, Hale told the officer that day that [Petitioner] was at the cemetery. Hale's statement, coupled with [Petitioner's] possession and use of Sanchez's credit card just hours later, showed [Petitioner's] presence there. Moreover, defense counsel was able to cross-examine Detective Mora about the photographic lineup and cross-examine Sanchez regarding his identification of [Petitioner] and the photographic lineup, and from there assert that Sanchez identified [Petitioner] because he was the only man in the lineup with a tattoo, rather than from his independent recollection of the man who was at the cemetery. While [Petitioner] asserts Sanchez's identification would have been cast into doubt had he been asked about the photographic lineup at the preliminary hearing, there is nothing in the record to suggest that Sanchez would have testified any differently than he did at trial, i.e. that [Petitioner] was the person he saw at the cemetery and he picked [Petitioner] out of the lineup based on his face, not his tattoos. In short, even were we to agree with [Petitioner's] claim that prosecutor engaged in misconduct, that error was harmless beyond a reasonable doubt in this case. (Pigage, supra, 112 Cal.App.4th at p. 1375.)

Because [Petitioner] cannot show prejudice, his claim that the prosecution's failure to provide the identification and lineup before the preliminary hearing constituted a Brady violation also must fail. Under Brady, supra, 373 U.S. 83, 87, the prosecution must not suppress "evidence favorable to an accused." A failure to disclose such evidence, whether willful or inadvertent, violates due process if the evidence "is material either to guilt or to punishment...." (Ibid.) Evidence is material only if there is " '... a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (In re

_Williams_ (1994) 7 Cal.4th 572, 611.) Evidence "favorable to the accused" includes both exculpatory evidence and impeachment evidence. (_Strickler v. Greene_ (1999) 527 U.S. 263, 281-282.)

The "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" (_Kyles v. Whitley_ (1995) 514 U.S. 419, 434.) In determining materiality, "[t]he reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." (_United States v. Bagley_ (1985) 473 U.S. 667, 683.)

For the reasons stated above, [Petitioner] has not demonstrated any prejudice from the late disclosure. The record shows that the disclosure of the evidence was not so late that [Petitioner] could not effectively address it; since the trial was continued, defense counsel was able to fully cross-examine Sanchez and Detective Mora about the photographic lineup, and argue to the jury that Sanchez identified [Petitioner] because of his tattoo. "No denial of due process occurs if _Brady_ material is disclosed to appellees in time for its effective use at trial." (_United States v. Higgs_ (3d Cir.1983) 713 F.2d 39, 44.)

Furthermore, [Petitioner] has not shown that the information belatedly discovered was material under _Brady_. Evidence other than Sanchez's identification of [Petitioner] placed [Petitioner] at the scene of the robbery, namely Hale's statement to the officer that [Petitioner] was there and [Petitioner's] possession of Sanchez's credit card just hours later. Defense counsel was able to cross-examine Detective Mora about the photographic lineup and cross-examine Sanchez regarding his identification of [Petitioner] from the lineup, and argue that Sanchez identified [Petitioner] because he was the only man in the lineup with a tattoo, not from his independent recollection of the man who was at the cemetery. [Petitioner] has not shown that it is reasonably probable the verdict would have been different had the evidence concerning the photographic lineup and Sanchez's statements to police been disclosed earlier by the prosecution, nor does the prosecution's belated disclosure of that evidence undermine our confidence in the verdict. Accordingly, the court did not err in finding no _Brady_ violation occurred.

(_See_ Resp't's Lodged Doc. 4)

1. Denial of Due Process Attributed to Prosecutorial Misconduct

The first issue Petitioner raises is that the prosecution's suppression of the photographic lineup, the victim's identification before the preliminary hearing, and his statements to police constituted prosecutorial misconduct that rendered his trial fundamentally unfair such that he was denied his right to due process under the 14th Amendment.

The Fifth DCA disagreed, citing the holding in _Darden v. Wainwright_, 477 U.S. 168, 181 (1986), that under federal law a prosecutor's conduct constitutes misconduct if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process" (citing _Donnelly v._

1   DeChristoforo, 416 U.S. 637 (1974)).  The Fifth DCA also cited California state law, that "[C]onduct

2   by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct

3   under state law only if it involves 'the use of deceptive or reprehensible methods to attempt to persuade

4   either the court or the jury' (citations omitted)."  People v. Hill, 17 Cal.4th 800, 819 (1998).

5       The Fifth DCA further held that even if prosecutorial conduct had occurred, it was not prejudicial

6   in Petitioner's case.  The court cited People v. Pigage, 112 Cal.App.4th 1359, 1375 (2003), holding that

7   "[a] violation of state law only is cause for reversal when it is reasonably probable that a result more

8   favorable to the defendant would have occurred had the district attorney refrained from the untoward

9   [conduct]."  Under federal law, misconduct that infringes upon a defendant's constitutional rights

10  mandates reversal of the conviction unless the reviewing court determines beyond a reasonable doubt

11  that it did not affect the jury's verdict.  Id. (citing Chapman v. California, 386 U.S. 18, 24 (1967)).

12      As a federal court in a habeas proceeding, we do not review questions of state law.  Our inquiry

13  is limited to whether the evidence ruling "resulted in a decision that was contrary to, or involved an

14  unreasonable application of, clearly established federal law, as determined by the Supreme Court of the

15  United States."  28 U.S.C. § 2254(d)(1).  Thus, the question here is whether the holding of the Fifth

16  DCA was contrary to, or involved an unreasonable application of clearly established federal law.  The

17  federal law is that prosecutorial misconduct only exists if that conduct "so infected the trial with

18  unfairness as to make the resulting conviction a denial of due process."  Darden, 477 U.S. at 181 (1986).

19      If prosecutorial misconduct occurs, it must also result in prejudice to the accused in order to

20  violate due process.  The federal rule applied by the Fifth DCA was that the conviction must be

21  overturned unless it is found beyond a reasonable doubt that the guilty verdict would have remained the

22  had the misconduct not occurred.  Chapman, 386 U.S. at 24.  The Chapman standard, however, does not

23  directly apply on collateral review.  In a habeas claim, the test is whether the error "had substantial and

24  injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619,

25  637 (1993) (quoting Kotteakos v. U.S., 328 U.S. 750, 776 (1946)).  "Under this standard, habeas

26  petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas

27  relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"  Brecht, 507

28  U.S. at 637.

1    Petitioner has not proven that the belated production of the evidence rendered his trial

2    fundamentally unfair.  After finding that the evidence was not provided to Petitioner until the eve of trial,

3    the trial court granted a continuance to Petitioner so that the defense could further investigate.  At trial,

4    defense stipulated to the introduction of the photographic lineup into evidence, even after the district

5    attorney had agreed not to introduce it.  Defense counsel was able to fully cross-examine both the victim

6    regarding his identification of Petitioner, as well as the police detective regarding the procedure used in

7    the photographic lineup.  In light of these facts, the Fifth DCA found that "defense counsel was able to

8    develop fully the inconsistencies in [the victim's] description of the robbers, as well as the

9    inconsistencies between that description and his identification of [Petitioner] from the photographic

10   lineup."

11   On the issue of prejudice, there is substantial evidence aside from the victim's identification that

12   places Petitioner at the scene of the robbery.  Petitioner's accomplice, Hale, gave a statement to a police

13   officer that night stating that Petitioner was present at the crime scene.  Also, Petitioner was in

14   possession of, and attempting to use, the victim's credit cards just hours after the robbery.  The defense

15   was able to cross-examine both the victim and the police detective regarding the identification and

16   photographic lineup.  The jury had a full opportunity to weigh the defense's argument that the victim

17   had identified Petitioner because he was the only person in the lineup with a tattoo.  Petitioner claims

18   that the victim's identification would have been cast into doubt if the defense could have questioned him

19   about it at the preliminary hearing, but there is nothing to suggest that the victim's testimony would have

20   been any different than that he gave at trial after the evidence had come to light.  Based on these facts,

21   the Fifth DCA held that the error, if there was an error, "was harmless beyond a reasonable doubt."

22   This Court finds that the delay in providing the identification and photographic lineup evidence

23   to the defense counsel did not have a substantial and injurious effect or influence in determining the

24   jury's verdict.  Brecht, 507 U.S. at 637.  Moreover, the Fifth DCA's application of the more favorable

25   "beyond a reasonable doubt" standard under Chapman, 386 U.S. at 24, was fairly applied.  The state

26   court's holding with respect to prosecutorial misconduct was not contrary to, nor was it an unreasonable

27   application of clearly established federal law.  28 U.S.C. § 2254(d)(1); see Darden, 477 U.S. at 181

28   (1986).  It was also not an unreasonable determination of the facts in light of the evidence.  28 U.S.C.

1   § 2254(d)(2).

2        2. Alleged Brady Violation

3        Petitioner also alleges that the trial court committed a violation of the rule in <u>Brady v. Maryland</u>,

4   373 U.S. 83 (1963), which holds that "the suppression by the prosecution of evidence favorable to an

5   accused upon request violates due process where the evidence is material either to guilt or to

6   punishment, irrespective of the good faith or bad faith of the prosecution." The Fifth DCA held that this

7   claim was unfounded; that the evidence in question was not favorable nor material to guilt or

8   punishment..

9        A violation under <u>Brady</u> requires proof by Petitioner of three elements. <u>Benn v. Lambert</u>, 283

10  F.3d 1040, 1052-53 (9th Cir. 2002). "First, the evidence at issue must be favorable to the accused,

11  because it is either exculpatory or impeachment material. <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667,

12  676 (1985). Second, the evidence must have been suppressed by the State, either willfully or

13  inadvertently. <u>See</u> <u>United States v. Agurs</u>, 427 U.S. 97, 110 (1976). Third, prejudice must result from

14  the failure to disclose the evidence. <u>See</u> <u>Bagley</u>, 473 U.S. at 678." <u>Benn</u>, 283 F.3d at 1052-1053.

15       Whether or not the photographic lineup evidence was favorable to Petitioner is, at best,

16  debatable. After all, the lineup in question was used by the victim to identify Petitioner. As for the

17  second element, the trial court did find that the State did not provide the defense with the evidence in

18  question until after the preliminary hearing, on the eve of the trial. However, the evidence was provided

19  to Petitioner before the trial itself, and the court gave a continuance to the defense so that the evidence

20  could be further investigated. The evidence was fully available for defense to address at trial. "No

21  denial of due process occurs if <u>Brady</u> material is disclosed to appellees in time for its effective use at

22  trial." <u>United States v. Higgs</u>, 713 F.2d 39, 44 (3rd Cir. 1983).

23       Petitioner also fails on the third element of <u>Brady</u>: whether or not the evidence was "material

24  to either guilt or punishment" <u>Brady</u>, 373 U.S. at 87, or in other words, whether Petitioner was

25  prejudiced. As cited by the Fifth DCA,

26       the "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective
         is important. The question is not whether the defendant would more likely than not have received
27       a different verdict with the evidence, but whether in its absence he received a fair trial,
         understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of
28       a different result is accordingly shown when the government's evidentiary suppression

'undermines confidence in the outcome of the trial.'" <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995).

In determining materiality, "[t]he reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." <u>Bagley</u>, 473 U.S. at 683.

As the Fifth DCA observed, evidence other than the victim's identification placed Petitioner at the scene of the robbery, and Petitioner was using the victim's credit card and identification just hours after the incident.  Also, defense counsel had a full opportunity at trial to discredit the identification during cross-examination of both the detective who arranged the lineup and the victim who made the identification.  The Fifth DCA held that Petitioner failed to show that it was reasonably probable that the verdict would have been different if the evidence had been disclosed earlier.

Prejudice is a critical component for an evidence ruling to violate the rule in <u>Brady</u>.  Based on these facts, and as discussed above on the issue of prejudice in violation of due process, this Court finds that Petitioner did not suffer any undue prejudice as a result of the untimely delivery of the lineup and identification evidence to the defense.  More importantly for habeas purposes, this Court finds that the state courts did not apply the three elements required under <u>Brady</u> in an unreasonable manner.

Petitioner's habeas petition consists solely of, by way of reference, Petitioner's petition to the California Supreme Court.  The petition referred to is not itself a habeas corpus petition, but rather a petition on direct appeal.  While it makes arguments rejecting the constitutionality of the various decisions of the trial and appellate courts, it does little to put forth any argument as to why Petitioner feels that the decisions of the California courts are contrary to, or an unreasonable application of, clearly established Federal law as is required to make a valid claim under the AEDPA.  28 U.S.C. § 2254(d).

Petitioner fails to demonstrate that the court's decision with regards to the suppression of the photographic lineup, the victim's identification before the preliminary hearing, and his statements to police was "contrary to, or involved an unreasonable application of, clearly established Federal law," or an "unreasonable determination of the facts in light of the evidence."  Therefore, the claim on these grounds is rejected.  28 U.S.C. § 2254(d).

B.  Impeachment of Petitioner With Prior Felony Convictions

Petitioner's second claim alleges the trial court abused its discretion in permitting impeachment of Petitioner with prior felony convictions and in admitting evidence of the nature of those convictions. Respondent contends Petitioner is incorrect and the state court reasonably rejected the claim.  This claim was also presented on direct appeal to the Fifth DCA where it was rejected.  The appellate court issued the last reasoned decision, as follows:

*II. Impeachment with Prior Convictions*

[Petitioner] contends the trial court abused its discretion in permitting the prosecutor to use five prior felony convictions for impeachment. He claims the convictions were remote; admission of the convictions was prejudicial by virtue of their sheer number; and that, because the prior offenses were based on similar conduct, the court at least should have "sanitized" them. We find no abuse of discretion.

Trial Proceedings

[Petitioner] brought a motion in limine to exclude his prior felony convictions, which the court deferred ruling on until it was determined whether [Petitioner] would testify. When the court took the matter up before [Petitioner's] testimony, the prosecutor explained that [Petitioner] had six felony convictions of the following crimes of moral turpitude: (1) two 1984 robbery convictions arising from the same incident; (2) a 1985 robbery conviction; (3) a separate 1985 forgery conviction; and (4) 1992 convictions for robbery and residential burglary arising from the same incident. The court offered to sanitize the names of the convictions. Defense counsel requested the crimes be described as "theft-related crimes," while the prosecutor asked to be allowed to impeach with the names of the crimes.

The court noted the second 1985 conviction for forgery had not been brought to its attention before, which the prosecutor agreed was a theft-related felony. The court ruled that the [sic] each crime could be described as a "theft-related felony." The court further ruled that [Petitioner] could be impeached with only one of the 1984 convictions, since the two 1984 convictions arose from the same incident, one of the 1992 convictions, for the same reason, and both of the 1985 convictions since they occurred at different times. Accordingly, the court stated the jury was entitled to know about: "a 1984 theft-related conviction, a 1985 theft-related conviction, a 1985 theft-related conviction and a 1992 theft-related conviction."

On direct examination, the following exchange occurred between defense counsel and [Petitioner]:

"Q. Can you explain to this jury why you didn't just stay there and explain to the officer that hey, I didn't know it was stolen?

"A. Can I explain to them?

"Q. Um-hum.

"A. I was-I was afraid to, um, stay there and try to clean it up, talk my way out of it.

"Q. And why were you afraid?

"A. Because I got five strikes, and I just freaked.

"Q. You have a prior past?

"A. Yes.

"Q.... Having a past criminal record, did you feel that whatever you said to the officer would not be believed?

"A. You know, honestly, I can't say that that's what went through my mind. What went through my mind was oh, no, is what went through my mind really. I was just scared. I can't say that I thought those thoughts.

"Q. Okay.

"A. I don't know. I just know I thought I gotta get out of there. That's what I thought.

"Q. Okay. Can you explain why you felt a need to get out of there?

"A. Um, isn't fear enough reason to-yeah, I'm an ex-felon.

"Q. Let me stop you there. I'm not asking you to speculate. I'm not trying to put words in your mouth. I just want the jury to understand why you ran from police. Is it your testimony you ran because you were afraid?

"A. Yeah.

"Q. Okay. And can you tell the jury what you were afraid of?

"A. Life.

"Q. Can you elaborate on that?

"THE COURT: Ms. [Defense Counsel]."

After that, a sidebar was held. Later on direct, [Petitioner] admitted he resisted the officers and he did so because of his past criminal record. [Petitioner] also responded "Yes," when defense counsel asked him if this past criminal record was "theft-related offenses."

On cross-examination, the prosecutor asked [Petitioner] whether it was true he suffered two felony convictions for robbery in February 1984, a robbery felony conviction in August 1985, a theft-related felony conviction in October 1985, and robbery and residential burglary convictions arising from the same incident in 1992. [Petitioner] confirmed he suffered each conviction.

After [Petitioner's] testimony, the court explained, outside the jury's presence, the discussion held during the sidebar. The court noted that [Petitioner] had volunteered that he had five strikes and used the term "life," and stated the prosecutor accordingly had asked to be allowed to inquire as to the description of the felonies "in excess of those which the Court had ruled," except for the forgery, which was still referred to as a theft-related offense. The court explained that "[w]ithout objection, that was the state of the testimony which the Court allowed given [Petitioner's] unsolicited response." The court noted [Petitioner] was present during its ruling on the in limine motion and the court's limitation as to the number of prior convictions that could be mentioned, upon which [Petitioner] expanded, and that defense counsel indicated it was not her intent that he discuss "that penalty or punishment." Defense counsel explained that she

discussed with [Petitioner] before his testimony that the People would be able to use the four felonies as theft-related to impeach him and his past was being sanitized so as not to unduly inflame the jury, and [Petitioner] "knowing that the jury would learn of his past, communicated that he wanted to take the stand and that he was not concerned about the jury learning of his past criminal record."

Analysis

Any witness in a criminal trial may be impeached with a prior felony conviction. (Evid.Code, § 788; People v. Sizelove (1955) 134 Cal.App.2d 104, 108.) The rationale is that the conviction is relevant to the jury's assessment of the witness's credibility, since the offense may reflect on the witness's honesty and veracity. (People v. Castro (1985) 38 Cal.3d 301, 314 (Castro); People v. Antick (1975) 15 Cal.3d 79, 97-98, disapproved on other grounds in People v. McCoy (2001) 25 Cal.4th 1111, 1123.)

The California Supreme Court in Beagle held that admissibility of prior felonies is subject to the trial court's discretion pursuant to Evidence Code section 352, which allows the trial court discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission would create a danger of undue prejudice. (People v. Beagle (1972) 6 Cal.3d 441, 452-453.) In Castro, the court further held that, subject to the trial court's discretion under section 352, only felonies involving moral turpitude (Castro, supra, 38 Cal.3d at p. 306), or a "general readiness to do evil," may be used for impeachment (id. at p. 314).

A trial court's decision to admit or exclude evidence under Evidence Code section 352 is reviewed for abuse of discretion. (People v. Mendoza (2007) 42 Cal.4th 686, 699.) A trial court's exercise of discretion will not be disturbed on appeal unless the court exceeds the bounds of reason such that the result manifests an injustice. (People v. Green (1995) 34 Cal.App.4th 165, 182-183 (Green); People v. Muldrow (1988) 202 Cal.App.3d 636, 644 (Muldrow).

In exercising its discretion to admit prior convictions for impeachment, the trial court should be guided by the four factors set out in Beagle: whether the prior conviction reflects on honesty and integrity; whether it is near or remote in time; whether it was incurred for the same or substantially similar conduct for which the witness-accused is on trial; and what effect admission would have on the defendant's decision to testify. (Castro, supra, 38 Cal.3d at p. 307, citing Beagle, supra, 6 Cal.3d 441.) Here, [Petitioner] does not contest that the first and last Beagle factors weigh in favor of admission, i.e. that the prior convictions were crimes of moral turpitude and the court's ruling did not prevent him from testifying. He claims, however, that the convictions should have been excluded on account of their remoteness, numerousness and similarity. We discuss each factor separately.

On the issue of remoteness, [Petitioner] argues the 1984, 1985 and 1992 convictions were very remote and, therefore, more prejudicial than probative since the current offenses occurred in July 2007. [Petitioner] asserts the convictions had little bearing on whether he was likely to tell the truth at trial 24, 23 and 16 years later. With regard to remoteness, Beagle instructs that a conviction from "long before," which "has been followed by a legally blameless life, should generally be excluded on the ground of remoteness." (Beagle, supra, 6 Cal.3d at p. 453, internal quotation marks omitted.) The trial court thus is entitled to consider not only the length of time elapsed since the prior offense, but also the defendant's subsequent conduct. (People v. Burns (1987) 189 Cal .App.3d 734, 738-739 (Burns).)

Appellate courts have concluded that 20-year-old convictions are not too remote to have probative value for impeachment purposes. (People v. Mendoza (2000) 78 Cal.App.4th 918, 925; Green, supra, 34 Cal.App.4th at p. 183; Burns, supra, 189 Cal.App.3d at pp. 737-738; People v. Massey (1987) 192 Cal.App.3d 819, 825.)[FN5] Although the prior convictions at issue were 24, 23, and 16 years old at trial, [Petitioner] did not lead a "legally blameless life" after his

convictions. (<u>Beagle</u>, <u>supra</u>, 6 Cal .3d at p. 453.) Since his 1984 convictions, he suffered subsequent convictions in 1985 and 1992 for offenses involving moral turpitude. He was sentenced to 17 years in prison on the 1992 convictions and violated parole in 2004. Although [Petitioner] minimizes the convictions, asserting they were "low-grade property crimes" related to his drug addiction, and points out that since his 1992 convictions he married, had a child, and had held a job since 2004 or 2005 as an in-home health care worker, the trial court reasonably could conclude, as it did, that [Petitioner's] continuing criminality outweighed the length of time that had passed from the original date of conviction. The systematic occurrence of [Petitioner's] priors over a 24-year period created a pattern that was relevant to his credibility. (<u>Green</u>, at p. 183, citing <u>Muldrow</u>, <u>supra</u>, 202 Cal.App.3d at p. 648.) The trial court did not abuse its discretion in failing to exclude the priors on grounds of remoteness.

> FN5. [Petitioner] asserts that "many if not most courts have endorsed ten years as a presumptive cutoff date for prior convictions," citing <u>People v. Pitts</u> (1990) 223 Cal.App.3d 1547, 1554 (<u>Pitts</u>). The court in <u>Pitts</u> held that the trial court exercised its discretion when determining whether a prior conviction was too remote by establishing a 10-year presumptive cutoff date for prior convictions. (<u>Ibid.</u>) It did not establish ten years as a presumptive cutoff date in all cases. [Petitioner] also cites two federal cases and a case from Texas which state that convictions over 10 years old are presumptively inadmissible, but these cases were decided under either federal or Texas rules of evidence that contain such a presumptive cutoff. (<u>United States v. Pope</u> (11th Cir.1998) 132 F.3d 684, 687; <u>United States v. Sloman</u> (6th Cir.1990) 909 F.2d 176, 181; <u>Sinegal v. State of Texas</u> (Tex.App.1990) 789 S.W.2d 383, 387.) California does not have a similar rule.

[Petitioner] next argues the trial court erred in permitting evidence of the nature of the robbery convictions, particularly in light of the fact that those convictions were identical to the charged offenses. [Petitioner] ignores, however, that the trial court initially ordered the convictions be referred to solely as theft-related felony offenses. It was only after [Petitioner] spontaneously testified that he had five strikes and was afraid of "life" that the trial court, without objection from defense counsel, granted the prosecutor's request to refer to the nature of the robbery convictions. Given that it was [Petitioner's] testimony that precipitated the change in the trial court's ruling, to which defense counsel did not object, arguably [Petitioner] cannot complain now that the trial court allowed the prosecutor to mention the nature of the crimes.

Nevertheless, the trial court did not abuse its discretion in refusing to sanitize the prior convictions after [Petitioner] testified that he had five strikes and was afraid of "life." Given [Petitioner's] admissions, the trial court reasonably could have determined the jury should know the nature of those crimes so as not to be misled into speculating what the five strikes were or to conclude the crimes were especially egregious, as well as to judge [Petitioner's] credibility. By learning of the specific nature of [Petitioner's] priors, the jurors were able to determine for themselves exactly how to factor them into an assessment of his credibility.

The fact that the prior convictions were identical to the crime charged does not automatically compel their exclusion. (<u>People v. Stewart</u> (1985) 171 Cal.App.3d 59, 66 (<u>Stewart</u>).) Courts have allowed as many as four identical convictions to impeach a defendant in a criminal trial. (<u>Green</u>, <u>supra</u>, 34 Cal.App.4th at p. 173 [four prior convictions for unlawful driving of a vehicle admitted in prosecution for unlawful driving of a vehicle]; <u>Muldrow</u>, <u>supra</u>, 202 Cal.App.3d at p. 647 [three prior convictions for burglary admitted in prosecution for burglary]; <u>Stewart</u>, <u>supra</u>, 171 Cal.App.3d at p. 63 [four prior convictions for robbery admitted in prosecution for robbery].) The trial court did not exceed the bounds of reason in admitting four prior convictions that were identical to the charged crime of robbery.

Finally, [Petitioner] contends the trial court abused its discretion by allowing five prior convictions to be admitted for impeachment, asserting one conviction would have been sufficient

to show the jury the nature of his prior record. But appellate courts have refused to impose arbitrary limits on the number of prior convictions admissible for impeachment. (People v. Castro (1986) 186 Cal.App.3d 1211, 1216 (Castro II); People v. Dillingham (1986) 186 Cal.App.3d 688, 695.) As many as 10 prior convictions have been held proper for impeachment in criminal trials. (Mendoza, supra, 78 Cal.App.4th at pp. 923, 927 [10 priors]; Green, supra, 34 Cal.App.4th at p. 173 [six priors]; Muldrow, supra, 202 Cal.App.3d at p. 646 [six priors]; Stewart, supra, 171 Cal.App.3d at p. 63 [four priors].) [Petitioner] is simply wrong in asserting that five is "too many." A series of crimes relevant to credibility is more probative than a single such offense. (Stewart, supra, 171 Cal.App.3d at p. 66.) [Petitioner] had a history of convictions stretching from 1984 to 1992. Moreover, his convictions-for robbery and forgery-were all extremely relevant to truthfulness. (Beagle, supra, 6 Cal.3d at 453.)

In sum, it is not the number of convictions used, but the question of whether there was undue prejudice by the use of any number of convictions such that we can say the trial court abused its discretion. We cannot find an abuse of discretion on this record. The prior convictions were probative of credibility and used only for that limited purpose. It cannot be said reasonably that allowing the use of five prior convictions was more prejudicial than any other number. In any event, we are satisfied the trial court's decision in this case, which was made after careful consideration, was not an abuse of the very broad discretion the trial court has in weighing the probative value of evidence against any potential for undue prejudice.

(See Resp't's Lodged Doc. 4)

As a federal court in a habeas proceeding, we do not review questions of state evidence law. Our inquiry is limited to whether the evidence ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" Wilson v. Corcoran, --- U.S. ---, 131 S.Ct. 13, 15 (2010) (quoting 28 U.S.C. § 2254(a)); see Estelle v. McGuire, 502 U.S. 62, 67 (1991). The issue is not whether the state courts violated their own evidentiary rules, but whether the admission of that evidence was an error so serious that the trial was rendered so arbitrary and fundamentally unfair as to violate Petitioner's constitutional rights to due process. Reiger v. Christensen, 789 F.2d 1425, 1430 (9th Cir. 1986); Jamaal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). It is, in fact, possible for a state court to violate its own rules of evidence without resulting in a trial so unfair as to violate due process. Jamaal, 926 F.2d at 919. "A state court's evidentiary rulings can form the basis for habeas relief under the due process clause only when they were so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process." Osborne v. Purkett, 411 F.3d 911, 917 (8th Cir. 2005) (citing Parker v. Bowersox, 94 F.3d 458, 460 (8th Cir. 1996)), cert. denied, 547 U.S.

1   1022 (2006).  The Supreme Court and federal law has long allowed evidence of prior crimes to be used

2   to impeach a defendant.  See Fed. R. Evid. 609(a); Old Chief v. U.S., 519 U.S. 172 (1997); Spencer v.

3   Texas, 385 U.S. 554 (1967).

4          Petitioner argues that the trial

5          "court's ruling was erroneous under the circumstances presented here it allowed the prosecution
           to utilize prior uncharged acts of the defendant, or so-called 'other crimes' or prior 'bad acts'
6          evidence (citations), to show criminal propensity and disposition, thus creating an 'over-strong
           tendency to believe the defendant guilty of the charge merely because he is likely a person [sic]
7          to do such acts.' (citations)."  Pet'r's Petition at 100.

8   The Court notes that there are no "uncharged acts" at issue here, the admitted evidence in question is

9   solely related to Petitioner's prior convictions.  Also, that the trial court twice gave the jury a clear

10  instruction that the prior convictions were to be used only to assess the witness's credibility.

11         Petitioner has not cited any relevant federal authority upon which he may rest a claim with

12  regards to the prior bad acts evidence, other than alleging that his Fourteenth Amendment right to due

13  process has been violated by the State.  Petitioner's claim is that the evidence of his prior convictions

14  violated his rights to due process because its probative value was far outweighed by the prejudice it

15  inflicted upon Petitioner.  The Supreme Court has generally given the states a very wide degree of

16  latitude in the promulgation of their own rules of criminal procedure.  See Spencer, 385 U.S. 554.  "It

17  is not the province of a federal habeas court to reexamine state-court determinations on state-law

18  questions."  Estelle, 502 U.S. at 67.  A writ of habeas corpus may only be granted where the admission

19  of that evidence was an error so serious that the trial was rendered so arbitrary and fundamentally unfair

20  as to violate Petitioner's constitutional rights to due process.  Reiger v. Christensen, 789 F.2d 1425, 1430

21  (9th Cir. 1986); Jamaal, 926 F.2d at 920.

22         In California, most evidence, including evidence of prior convictions, is subject to Cal. Evid.

23  Code § 352 which states, "[t]he court in its discretion may exclude evidence if its probative value is

24  substantially outweighed by the probability that its admission will . . . (b) create substantial danger of

25  undue prejudice, of confusing the issues, or of misleading the jury."  Cal Evid. Code § 352(b).  This rule

26  specifically addresses evidence that is more prejudicial than probative.  The Fifth DCA held that under

27  § 352, the trial court must determine "whether the prior conviction reflects on honesty and integrity;

28  whether it is near or remote in time; whether it was incurred for the same or substantially similar conduct

for which the witness-accused is on trial; and what effect admission would have on the defendant's decision to testify [citations]."  The defense conceded that the prior convictions were crimes of moral turpitude and that the court's ruling did not prevent him from testifying.  Petitioner contended that the prior convictions should have been excluded based on their remoteness, numerousness, and similarity.

The Fifth DCA analyzed each of these factors, and in each case, determined that under California state law none of these factors warranted the exclusion of the evidence.  It found that it was not unreasonable to allow all five convictions to be used, as multiple prior convictions are more probative to credibility than a single prior conviction.  Furthermore, it found that the convictions were not too remote in time to be allowed under state law, especially given that Petitioner had spent much of his time between crimes behind bars.  Notably, the court had sustained a motion in limine requiring that the nature of the felonies be sanitized, and that they be referred to only as "theft-related felonies."  However, on direct exam, defense counsel asked a number of questions which had the effect of eliciting more detail from the defendant regarding the context of his prior convictions.  The defendant's responses revealed that he had five strikes and could face life in prison.  Thereafter, the trial court, without objection from defense counsel, granted the prosecutor's request to refer to the nature of the robbery convictions.  The appellate court held that "the trial court reasonably could have determined the jury should know the nature of those crimes so as not to be misled into speculating what the five strikes were or to conclude the crimes were especially egregious, as well as to judge [Petitioner's] credibility. By learning of the specific nature of [Petitioner's] priors, the jurors were able to determine for themselves exactly how to factor them into an assessment of his credibility."  Resp't's Lodged Doc. No. 4 at 21-22.

This Court finds that the Fifth DCA conducted a reasonable review of the trial court's rulings under the appropriate "abuse of discretion" standard and that there is nothing here to indicate that Petitioner's trial or his appeal were "fundamentally unfair" or that he has otherwise suffered any deprivation of due process under the Constitution.  The probative value of the prior convictions was fairly weighed against the prejudice therein in the application of Cal. Evid. Code § 352.  This Court cannot say that the trial or appellate courts rulings were "contrary to, or involved an unreasonable

1    application of, clearly established Federal law," or an "unreasonable determination of the facts in light

2    of the evidence."  Therefore, the claim on these grounds is rejected.  28 U.S.C. § 2254(d).

3        C.  Loss of Section 969(b) Packet

4        Petitioner's third claim alleges that the loss of a piece of evidence used at trial, Petitioner's §

5    969(b) packet, denied Petitioner his rights to due process and meaningful appellate review in violation

6    of Amendment XIV.  Respondent contends Petitioner is incorrect and the state court reasonably rejected

7    the claim.  On appeal, Petitioner sought to obtain the § 969(b) packet that was used as evidence for his

8    trial on prior convictions.  Petitioner contends that "due to the loss of the 969(b) packet, he lacks a

9    complete record for purposes of securing appellate review of possible issues relating to the prior

10   convictions and the validity of 'true' findings thereon."  Pet'r's Petition at 107.  This claim was also

11   presented on direct appeal to the Fifth DCA where it was rejected.  The appellate court issued the last

12   reasoned decision, as follows:

13       *III.  The Lost Section 969, Subdivision (b) Packet*

14           At the bifurcated trial on the prior conviction allegations, the court first heard, outside
         the jury's presence, the issue of identification. Joe Isquierdo, an identification technician with
15       the Fresno Police Department Crime Scene Bureau, compared [Petitioner's] right thumbprint,
         which he obtained when he took inked fingerprints from all 10 of [Petitioner's] fingers, to the
16       right thumbprint on two pages of [Petitioner's] section 969, subdivision (b) packet, and
         determined the prints matched. The fingerprint record Isquierdo obtained was entered into
17       evidence as Exhibit 9, while the section 969, subdivision (b) packet, was entered into evidence
         as Exhibit 8. The trial court reviewed the section 969, subdivision (b) packet; the court noted
18       the packet had the Department of Corrections' seal on it with a signature dated August 2, 2007,
         and that the last page of the packet was a photograph which showed a picture of an individual
19       dated April 5, 2005 bearing the name Stitt [Petitioner] and a number "D12370." The court
         compared the photograph to [Petitioner] and stated it believed the photograph was of
20       [Petitioner]. The court then determined beyond a reasonable doubt that the section 969,
         subdivision (b) packet was [Petitioner's].
21
             The jury was then called in to determine the matters of the prior convictions and prior
22       prison felonies. Emilio Valle, a probation services manager with the Fresno County Probation
         Department, testified that Exhibit 8 was [Petitioner's] certified section 969, subdivision (b)
23       packet, which contained a chronological history and several abstracts of judgment pertaining
         to particular convictions. Valle found the following abstracts of judgment in the packet, which
24       belonged to [Petitioner]: (1) a November 8, 1983, section 211 robbery conviction out of Fresno
         County Superior Court case number 303672-0; (2) a November 8, 1983, section 211 robbery
25       conviction out of Fresno County Superior Court case number 303672-0; (3) a July 3, 1985,
         section 211 conviction out of Kern County Superior Court case number 29743; (4) a November
26       20, 1992, section 211 conviction out of Fresno County Superior Court case number 470546-3;
         and (5) a November 20, 1992, section 459/460(a) conviction out of Fresno County Superior
27       Court case number 470546-3.

28           Valle reviewed the chronological history in the packet and did not see any five-year

period since August 5, 1985, the date he was received into custody on his July 3, 1985 section 211 conviction, that he had been free of custody, and that during that period, [Petitioner] had picked up a section 459/460(a) felony conviction in Fresno County Superior Court case number 470546-3 on November 20, 1992. Valle also testified that based on the abstract of judgment for the section 459/460(a) conviction, the conviction looked to be for a first degree, or residential, burglary. Valle reviewed the report of the probation officer for the section 459/460(a) conviction, the first and last pages of which were entered into evidence as Exhibit 7a, and determined from the face sheet that the conviction was for first degree residential burglary.

The jury was instructed that it already had been determined that [Petitioner] was named in the exhibits and the jury was to determine whether the evidence proves [Petitioner] was convicted of the alleged crimes. The jury was further instructed that if it found [Petitioner] had been convicted of a violation of section 211 on July 3, 1985 and of section 459/460 on November 20, 1992, the jury must also decide whether the People had proven [Petitioner] served a separate prison term for the crimes and did not remain out of prison custody and free of a new felony conviction for five years. After deliberating, the jury found true allegations that [Petitioner] had been convicted of the felony convictions Valle had testified to and that [Petitioner] had been convicted of a felony violation of section 211 on July 3, 1985, and a felony violation of section 459/460 on November 20, 1992, and served a term in prison for each conviction within the meaning of section 667.5(b).

Based on the jury's finding, the court found that the five prior convictions, four for robbery and one for residential burglary, were all strikes pursuant to the three strikes law, section 667, subdivisions (b) through (i) and 1170.12, subdivision (a), and also were serious felonies within the meaning of section 667, subdivision (a)(1).

Before the opening brief was filed on appeal, we granted [Petitioner's] request to augment the record with, inter alia, People's exhibits 7-A, 8 and 9, and directed the Fresno County Superior Court clerk to transmit the exhibits. In response, a deputy clerk declared to this court that the trial court had received the order to augment the record and, after two extensive searches of the case file, exhibit clerk's office and exhibit room, the requested items could not be located.

Seizing upon this error, [Petitioner] argues we must reverse the prior convictions findings because the actual exhibits are not available for us to review. He asserts that without the section 969, subdivision (b) packet, he lacks a complete record to secure "appellate review of possible issues relating to the prior convictions and the validity of the 'true' findings thereon." He contends record settlement is not a viable option because without the actual trial exhibit, "there is nothing with which to compare a substitute exhibit for purposes of determining the accuracy and completeness of the substitute." Citing People v. Serrato (1965) 238 Cal.App.2d 112 (Serrato), he argues his inability to affirmatively show error cannot be held against him because the exhibits were lost due to state action, and contends his federal rights to meaningful appellate review, due process and equal protection have been violated.

We disagree. [Petitioner] is correct that a criminal defendant is entitled to a record on appeal that is "adequate to permit meaningful appellate review." (People v. Seaton (2001) 26 Cal.4th 598, 699 (Seaton); People v. Harris (2008) 43 Cal.4th 1269, 1280 [state law entitled a defendant only to an appellate record adequate to permit him to argue the points raised on appeal; federal constitutional requirements are similar].) There is no rule of appellate procedure, however, that mandates reversal per se for lost trial exhibits; instead, "'[t]he record on appeal is inadequate ... only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal.'" (Seaton, supra, 26 Cal.4th at p. 699; People v. Coley (1997) 52 Cal.App.4th 964, 969 (Coley).)

Reconstruction of lost parts of the original trial record is an accepted mechanism that

permits meaningful appellate review and avoids automatic reversal. (People v. Osband (1996) 13 Cal.4th 622, 663 (Osband).) In Coley, supra, 52 Cal.App.4th 964, a defendant convicted of assault with a deadly weapon and found to have prior convictions contended he was entitled to reversal because the knife used in the assault and the documentation supporting the prior conviction allegations had been lost. The Court of Appeal rejected this contention, explaining: "Criminal defendants are entitled to due process, not perfect process. [Citation.] Thus, an imperfect representation of the exhibits is not grounds for reversal unless it is reasonably probable the outcome is affected by the deficiencies in the record.... [¶] While the defendant is entitled to a record adequate to afford a meaningful appeal, he bears the burden to show the deficiencies in the record are prejudicial. [Citation.] That burden is not carried by simply citing an administrative dereliction. Lost exhibits may be reconstructed in many instances. [Citation.] If they can be reconstructed, the appellate court can review them as if they had not been lost, with no resulting prejudice to the defendant. As models or replicas are admissible in the absence of an actual piece of evidence to assist the jury, reconstructed exhibits similarly assist the appellate court. [Citation.] Consequently, it would be a violation of the constitutional requirement that we not reverse a conviction absent prejudice if we were to reverse a conviction because the exhibits were lost when no attempt has been made to reconstruct them. [Citation.] The test is whether the exhibits can be reconstructed sufficiently to determine there was no prejudicial error at trial." (Coley, supra, at pp. 969-970, citing Osband, supra, 13 Cal.4th 622.)

The court in Coley held that since an appellant has the burden to perfect the appeal and to show error and resulting prejudice, "the defendant must move for reconstruction of lost exhibits because, without at least an attempt at reconstruction and a settled statement concerning any exhibit that cannot be reconstructed, the defendant cannot show the loss of the exhibits resulted in prejudice to his right to a record adequate to afford meaningful appellate review." (Coley, supra, 52 Cal.App.4th at p. 972.) The court concluded that because the defendant made no effort to obtain reconstruction of the lost exhibits, his contentions concerning sufficiency of the evidence were not properly raised. (Id. at p. 973.)

The reasoning in Coley applies here. [Petitioner] failed to move for reconstruction of the section 969, subdivision (b) packet. Although he asserts it cannot be reliably reconstructed, this cannot be determined until reconstruction is at least attempted. Since there is nothing before us to show that the packet cannot be reconstructed, [Petitioner's] reliance on Serrato is misplaced. There, no reporter's transcript was filed as a result of court officials' mistakes, and the transcript could not be reconstructed because the reporters' notes had been destroyed, the judge who tried the case had died, the district attorney was no longer in office, and the official court reporter was no longer available. (Serrato, supra, 238 Cal.App.2d at pp. 114-115.) The appellate court ordered the convictions reversed because the state was responsible for the inability to provide a transcript and there was a complete failure to furnish the documents necessary to permit the defendant to urge a reversal of the judgment. (Id. at pp. 118-119.) In contrast here, no attempt has been made, because [Petitioner] did not request reconstruction, to determine whether the packet can be reconstructed. Without such a request, [Petitioner] is not entitled to reversal of the findings on the prior conviction allegations.

Moreover, [Petitioner] does not show what error could possibly be revealed if we had the section 969, subdivision (b) packet. [Petitioner's] consecutive 25-to-life terms were based on his having been sentenced as a three-striker under the three strikes law due to his prior convictions, all of which he admitted at trial were his. Of the five convictions the jury found [Petitioner] had suffered, four were for robbery, which unambiguously constitutes a violent felony, and therefore a strike, within the meaning of the three strikes law. (§§ 667, subds.(b), (d), 667.5, subd. (c)(9) [listing "[a]ny robbery" as a "'violent felony'"].) [Petitioner] also was sentenced to a determine [sic] 15-year-term under section 667, subdivision (a), which provides increased punishments for prior convictions for serious felonies defined in section 1192.7, subdivision (c), that includes "robbery or bank robbery." (§§ 667, subd. (a), 1192.7, subd. (c)(19).) Although the jury also found true allegations that [Petitioner] had suffered prior prison

terms within the meaning of section 667.5, the court did not impose any additional sentence pursuant to these findings. Under the circumstances, there is no chance that, once the exhibit is reconstructed, this court will conclude either that the trial court or jury erred in finding the prior conviction allegations true or that prejudice resulted from any error.

(See Resp't's Lodged Doc. 4)

The issue presented here deals primarily with the California courts' application of state procedural law. As a federal court in a habeas proceeding, we do not review questions of state law. Our inquiry is limited to whether the state ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); see Estelle, 502 U.S. at 67. The issue is not whether the state courts violated their own evidentiary rules, but whether the admission of that evidence was an error so serious that the trial was rendered so arbitrary and fundamentally unfair as to violate Petitioner's constitutional rights to due process. Reiger, 789 F.2d at 143; Jamaal, 926 F.2d at 920.

Petitioner is claiming that this error of the court resulted in a violation of his right to meaningful appellate review under a theory of due process and equal protection. Petitioner cites as federal authority U.S. Const. amend. XIV; Evitts v. Lucey, 469 U.S. 387, 400-401 (1985) (right to effective assistance of counsel on first appeal as of right); Hicks v. Oklahoma, 447 U.S. 343 (1980) (jury instruction regarding sentencing held to be incorrect by Oklahoma Supreme Court deprived defendant of due process); and Griffin v. Illinois, 351 U.S. 12, 19 (1956) (state failure to provide free trial transcript to indigent defendant on appeal is a violation of the equal protection clause). This Court fails to see how any of these cases are analogous to Petitioner.

Petitioner argues that because he was unable to gain possession of his *original* § 969(b) packet, that he was unable to expose any potential error in the determination of his prior convictions with respect to his "three strikes" hearing. This argument is utterly without merit. First of all, Petitioner did not even make an attempt to have the packet reconstructed, as allowable under California law, in order to make a determination that it could not be reconstructed. This Court cannot say that Petitioner's right to due process under state law was violated when Petitioner failed to take advantage of the procedures the state made available to him in addressing the missing evidence. Furthermore, even if there was a violation of due process, it is extremely unlikely that any prejudice occurred therefrom. For a writ of habeas

corpus to be granted, the petitioner must show that actual prejudice resulted from any alleged error by the state courts.  See Brecht, 507 U.S. at 638; Kotteakos, 328 U.S. 750.  Petitioner himself testified at trial regarding his prior convictions, indicating that he had five strikes already against him.  Petitioner had, in effect, stipulated to the accuracy of the contents found to be in his § 969(b) packet at trial.  Had Petitioner been able to review his original § 969(b) packet, it is extremely unlikely that the resulting opinion of the Fifth DCA on his appeal would have been any different.

Based on Petitioner's failure to request that his § 969(b) packet be reconstructed, his own testimony with regards to his prior convictions, and the substantial evidence in the record describing Petitioner's § 969(b) packet, this Court finds that there was no violation of Petitioner's equal protection or due process rights to a meaningful appeal.  Moreover, this Court finds that the Fifth DCA did not apply any federal law in a manner that was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or that it based its holding on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  Accordingly, Petitioner's claim on this particular ground is denied.

### D.  California's Three Strikes Law Violates the Eighth Amendment

Petitioner alleges that his sentence under California's "three strikes" recidivist sentencing statute was so disproportionate to the nature of the offenses that it violated the Eighth Amendment proscription against cruel and unusual punishment.  Respondent contends Petitioner is incorrect and the state court reasonably rejected the claim.  This claim was also presented to the Fifth DCA where it was rejected. The appellate court issued the last reasoned decision, as follows:

Consequently, we turn to [Petitioner's] argument that his sentence is constitutionally disproportionate. In determining whether punishment is constitutionally disproportionate, the courts examine the nature of the offense and offender, the punishment the same jurisdiction imposes for other offenses, and the punishment other jurisdictions impose for the same offense. (Solem v. Helm (1983) 463 U.S. 277, 290-291, overruled on another ground by Harmelin v. Michigan (1991) 501 U.S. 957, 964-965; In re Lynch (1972) 8 Cal.3d 410, 425-427.) A punishment involving "unnecessary and wanton infliction of pain" or "grossly out of proportion to the severity of the crime" violates the Eighth Amendment. (Gregg v. Georgia (1976) 428 U.S. 153, 173.) A punishment "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity" violates article I, section 17 of the California Constitution. (In re Lynch, supra, 8 Cal.3d at p. 424, fn. omitted.)

California statutes imposing harsher punishment on recidivists have long withstood constitutional challenge. (See People v. Weaver (1984) 161 Cal.App.3d 119, 125-126, and cases

cited.) [Petitioner] argues "the 'robbery' in the present case was a nonviolent theft[,]" that was technically a felony robbery by operation of law which permitted "a simple theft to be characterized as a robbery if a threat of force is employed to effect an escape with the fruits of the theft after the fact of the theft." He also asserts the triggering offense is "relatively minor" and if there was a pattern, it was broken by his 13-year abstinence from drugs. Not so. The primary goals of a recidivist statute "are to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time." (Rummel v. Estelle (1980) 445 U.S. 263, 284-285.) Defining that point in one's life and setting that time are both "matters largely within the discretion of the punishing jurisdiction." (Id. at p. 285.) [Petitioner's] sentence constitutes neither cruel and unusual punishment under the federal Constitution nor cruel or unusual punishment under the state Constitution. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17; see Ewing v. California (2003) 538 U.S. 11, 20-31; Lockyer v. Andrade (2003) 538 U.S. 63, 66-77; People v. Martinez (1999) 71 Cal.App.4th 1502, 1516-1517.)

(See Resp't's Lodged Doc. 4)

Petitioner urges this Court to disagree with the U.S. Supreme Court's prior rulings with respect to California's "three strikes" law, and rule it unconstitutional as a violation of the Eighth Amendment. It is not within the province of this Court to do so. As a federal court in a habeas proceeding, our determination is restricted to whether the state court's ruling was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or that it based its holding on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

The Supreme Court held in Ewing v. California, 538 U.S. 11, 12 (2003) that California's "three strikes" law did not violate the Eighth Amendment, holding that:

"State legislatures enacting three strikes laws made a deliberate policy choice that individuals who have repeatedly engaged in serious or violent criminal behavior, and whose conduct has not been deterred by more conventional punishment approaches, must be isolated from society to protect the public safety. Though these laws are relatively new, this Court has a longstanding tradition of deferring to state legislatures in making and implementing such important policy decisions. The Constitution "does not mandate adoption of any one penological theory," [citation], and nothing in the Eighth Amendment prohibits California from choosing to incapacitate criminals who have already been convicted of at least one serious or violent crime. Recidivism has long been recognized as a legitimate basis for increased punishment and is a serious public safety concern in California and the Nation. Any criticism of the law is appropriately directed at the legislature, which is primarily responsible for making the policy choices underlying any criminal sentencing scheme."

In Lockyer, 538 U.S. 63, a habeas corpus case, the Supreme Court again upheld a constitutional challenge to California's "three strikes" law. The defendant in that case had received "three strikes" sentencing after being found guilty of stealing video tapes with a total value of around $150. The Court noted that under the AEDPA, a habeas writ can only be granted where there is a holding that is contrary

1  to, or an unreasonable application of, "clearly established federal law." 28 U.S.C. 2254(d); Lockyer, 538

2  U.S. at 72. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

3  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

4  state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."

5  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,'

6  a federal habeas court may grant the writ if the state court identifies the correct governing legal principle

7  from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

8  Williams, 529 U.S. at 413.

9          The court determined that the only clearly established law with respect to sentencing and the

10  Eighth Amendment was the "gross proportionality principle" found in Harmelin v. Michigan, 501 U.S.

11  957 (1991) (imposition of mandatory sentence of life in prison without possibility of parole, without any

12  consideration of mitigating factors, such as fact that petitioner had no prior felony convictions, did not

13  constitute cruel and unusual punishment; severe, mandatory penalties may be cruel, but they are not

14  unusual in the constitutional sense).  It found that Harmelin was itself somewhat unclear in its

15  application, and that other cases also applied, including Rummel v. Estelle, 445 U.S. 263 (1980)

16  (mandatory life sentence imposed under Texas recidivist statute following defendant's third felony

17  conviction for obtaining $120.75 by false pretenses did not constitute cruel and unusual punishment),

18  and Solem v. Helm, 463 U.S. 277 (1983) (life imprisonment without parole for $100 check fraud and

19  three prior convictions for third-degree burglary, one prior for obtaining money under false pretenses,

20  one prior of grand larceny, and one prior of third-offense driving while intoxicated, was significantly

21  disproportionate to his crime, and was prohibited by Eighth Amendment, because uttering a "no

22  account" check was a nonviolent crime, defendant's prior felonies were relatively minor, the sentence

23  was the most severe that the state could impose on any criminal and only one other state authorized life

24  sentence without parole in circumstances of defendant's case).

25          The Supreme Court held that the facts in Lockyer were not materially indistinguishable from any

26  of those cases, nor had the state appellate court unreasonably applied the law from any of those cases.

27  The Court went on to state that "[t]he gross disproportionality principle reserves a constitutional

28  violation for only the extraordinary case. In applying this principle for § 2254(d)(1) purposes, it was not

1    an unreasonable application of our clearly established law for the California Court of Appeal to affirm

2    Andrade's sentence of two consecutive terms of 25 years to life in prison."

3           Similarly, the facts present in Petitioner's case are not materially indistinguishable from Ewing,

4    Lockyer, Harmelin, Rummel, or Solem.  Moreover, this Court finds that the Fifth DCA's application of

5    federal law was generally consistent with that clearly established in those cases, and with respect to

6    Petitioner's claim, was not unreasonable.  Therefore, Petitioner's claim on these grounds is rejected.  See

7    28 U.S.C. § 2254(d).

8    IV.    Certificate of Appealability

9           A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district

10   court's denial of his petition, and an appeal is only allowed in certain circumstances.  Miller-El, 537 U.S.

11   at 335-336 (2003).  The controlling statue in determining whether to issue a certificate of appealability

12   is 28 U.S.C § 2253 (2010), which provides as follows:

13   (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final
     order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding
14   is held.

15   (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant
     to remove to another district   or place for commitment or trial a person charged with a criminal offense
16   against the United States, or to test the validity of such person's detention pending removal proceedings.

17   (c)     (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be
             taken to the court of appeals from –
18
                    (A) the final order in a habeas corpus proceeding in which the detention
19                  complained of arises out of precess issued by a State court; or

20                  (B) the final order in a proceeding under section 2255.
             (2) A certificate of appealability may issue under paragraph (1) only if the applicant has
21           made a substantial showing of the denial of a constitutional right.

22                  (3) The certificate of appealability under paragraph (1) shall indicate which specific issue
                    or issues satisfy the showing required by paragraph (2).
23
             If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if
24
     jurists of reason could disagree with the district court's resolution of his constitutional claims or that
25
     jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."
26
     Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000).  While the petitioner is not
27
     required to prove the merits of his case, he must demonstrate "something more than the absence of
28

frivolity or the existence of mere good faith on his . . . part." <u>Miller-El</u>, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly the Court hereby DECLINES to issue a certificate of appealability.

## ORDER

Accordingly, IT IS HEREBY ORDERED that:

1.    The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

2.    The Clerk of Court is DIRECTED to enter judgment in favor of Respondent; and

3.    The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

**Dated:    February 11, 2011**                    **/s/ Lawrence J. O'Neill**
                                                                UNITED STATES DISTRICT JUDGE